**In the Matter of the WELFARE OF J.H., Child.**

No. A12–1405.

Court of Appeals of Minnesota.

March 4, 2013.

Review Granted May 29, 2013.

608

Lori Swanson, Attorney General, St. Paul, MN; and John Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, St. Paul, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Leslie J. Rosenberg, Assistant Public Defender, St. Paul, MN, for appellant child.

Considered and decided by CLEARY, Presiding Judge; HOOTEN, Judge; and COLLINS, Judge.*

## OPINION

CLEARY, Judge.

Appellant challenges the district court's order certifying him as an adult, arguing that the court abused its discretion by determining that appellant did not establish by clear and convincing evidence that retaining the proceeding in juvenile court is in the best interests of public safety, and further arguing that certifying appellant as an adult is unconstitutional. Because we conclude that the court failed to comply with Minn.Stat. § 260B.125, subd. 4, by not expressly giving greater weight to both the seriousness of the offense and the lack of a prior record of delinquency, and because we conclude that the court abused its discretion by determining that appellant's programming history, the adequacy of the punishment or programming available, and the dispositional options available favor adult certification, we reverse.

## FACTS

On November 17, 2011 M.Y. picked up G.K. and a friend from school and took them to a party at a house in St. Paul, where they drank alcohol. M.Y., G.K., G.K.'s friend, and others left the party and went to another house, also in St. Paul, and everyone continued to drink. G.K. and her friend told M.Y. that they wanted to leave the house and got into M.Y.'s car, which was parked outside the house. G.K.'s friend was mad at M.Y. because he did not want to leave. The friend took M.Y.'s cell phone and walked down the street to look for street signs so she could tell someone where to pick them up. S.L. and Jo.H. came to the car looking for G.K.; they grabbed her under the arms and carried her back into the house. G.K. tried to resist, grabbing at everything, including door frames, to prevent S.L. and Jo.H. from carrying her into the house.

Once inside, G.K. was taken into a bedroom and slammed onto a mattress. At least two people in the room held G.K. down while she was digitally penetrated, and at least one male raped her. One individual told everyone in the room that the police were coming, and everyone except G.K. ran out of the room. G.K.'s friend and M.Y. were looking for G.K. and found her coming out of the bedroom, crying and pulling up her pants.

Appellant, who had turned 17 three days earlier, was present in the bedroom when the assault took place. He did not assault G.K. or hold her down, but he told officers that she was yelling for help and that someone was covering her mouth. Appellant and all of the other males present are members of or associated with a street gang called the True Blood 22 Gang, or TB22. TB22 is a documented criminal street gang operating in the Twin Cities. M.Y. stated that it was the gang's intent to get G.K. and her friend drunk and rape them on the night of November 17.

In March 2012, appellant was charged with first-degree criminal sexual conduct

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

in violation of Minn.Stat. § 609.342, subd. 1(f)(i) (2010), conspiracy to commit first-degree criminal sexual conduct in violation of Minn.Stat. § 609.175, subd. 2(3) (2010), kidnapping in violation of Minn.Stat. § 609.25, subd. 1(2) (2010), and committing a crime for the benefit of a gang in violation of Minn.Stat. § 609.229, subd. 2 (2010). The state filed a motion asking the district court to certify appellant to stand trial as an adult pursuant to Minn.Stat. § 260B.125, subd. 3 (2010).

The district court held a certification hearing over three days in May and June 2012. At the certification hearing, the district court received into evidence a report from a juvenile probation and parole certification study (certification study) prepared by Kao Dua Chi Moua and a report from a psychological evaluation prepared by Dr. Gary Hertog, a clinical psychologist. Both reports recommended designating appellant an extended jurisdiction juvenile (EJJ). Both Moua and Dr. Hertog testified extensively at the certification hearing.

In July 2012, the district court issued an order certifying appellant to stand trial as an adult. The court noted that it considered six factors when determining whether to certify appellant for adult prosecution pursuant to Minn.Stat. § 260B.125, subd. 3–4. The court also noted that greater weight is given to the seriousness of the alleged offense and the child's prior record of delinquency than to the other four factors, but did not expressly weigh appellant's prior record of delinquency in a manner distinguishable from the weighing of the other four factors. The court discussed each of the six factors, determined that appellant did not establish "by clear and convincing evidence that retaining this proceeding in the juvenile court is [ ] in the best interest of public safety," and ruled that the case would proceed as an adult certification. This appeal follows.

## ISSUES

I. Did the district court abuse its discretion by determining that appellant's programming history, the adequacy of the punishment or programming available, and the dispositional options available favor adult certification?

II. Did the district court abuse its discretion by giving greater weight to the seriousness of the offense but not to appellant's prior record of delinquency?

## ANALYSIS

"A district court has considerable latitude in deciding whether to certify a case for adult prosecution. Its decision will not be reversed unless [the court's] findings are clearly erroneous so as to constitute an abuse of discretion." *In re Welfare of D.T.H.*, 572 N.W.2d 742, 744 (Minn.App.1997) (alteration in original) (quotations and citation omitted), *review denied* (Minn. Feb. 19, 1998).

Minnesota law provides a presumption of certification to adult court when

(1) the child was 16 or 17 at the time of the offense; and

(2) the delinquency petition alleges that the child committed an offense that would result in a presumptive commitment to prison . . .

If the court determines that probable cause exists to believe the child committed the alleged offense, the burden is on the child to rebut this presumption by demonstrating by clear and convincing evidence that retaining the proceeding in the juvenile court serves public safety. If the court finds that the child has not rebutted the presumption by clear

and convincing evidence, the court shall certify the proceeding.

Minn.Stat. § 260B.125, subd. 3.

There is no dispute that a presumption of certification existed in this case and that appellant bore the burden of demonstrating by clear and convincing evidence that retaining the proceeding in juvenile court serves public safety.

■ In determining whether certification would serve public safety, the court considers the following statutory factors:

(1) the seriousness of the alleged offense in terms of community protection, including the existence of any aggravating factors recognized by the Sentencing Guidelines, the use of a firearm, and the impact on any victim;

(2) the culpability of the child in committing the alleged offense, including the level of the child's participation in planning and carrying out the offense and the existence of any mitigating factors recognized by the Sentencing Guidelines;

(3) the child's prior record of delinquency;

(4) the child's programming history, including the child's past willingness to participate meaningfully in available programming;

(5) the adequacy of the punishment or programming available in the juvenile justice system; and

(6) the dispositional options available for the child.

*Id.,* subd. 4. The court must give greater weight to factors one and three than to the other factors. *Id.* "We cannot emphasize too strongly that the district court must place greater weight on the severity of the

alleged crime and the prior delinquency record of the juvenile in deciding whether to certify." *In re Welfare of P.C.T.,* 823 N.W.2d 676, 684 (Minn.App.2012) (quoting *St. Louis Cnty. v. S.D.S.,* 610 N.W.2d 644, 650 (Minn.App.2000)), *review denied* (Minn. Feb. 19, 2013). Here, the district court concluded that only factor three, which is to receive greater weight than four of the factors and equal weight to the seriousness-of-the-offense factor, favors EJJ designation and that appellant failed to overcome the presumption of certification on all of the remaining factors.[1]

**I. By determining that appellant's programming history, the adequacy of the punishment or programming available, and the dispositional options available favor adult certification, the district court abused its discretion.**

*Seriousness of the Offense*

When determining whether public safety is served by certifying the matter, the court shall consider "the seriousness of the alleged offense in terms of community protection, including the existence of any aggravating factors recognized by the Sentencing Guidelines, the use of a firearm, and the impact on any victim." Minn.Stat. § 260B.125, subd. 4(1).

■ The district court found that "the acts alleged in the Petition which this Court must accept as true, constitute vulturine behavior which should not and cannot be tolerated in this community." Appellant does not appear to dispute that this factor favors adult certification. The record supports the district court's determi-

---

1. The dissent cites a footnote from *In re Welfare of D.M.D.,* 607 N.W.2d 432 (Minn.2000) for guidance from our supreme court as to weighing of the factors. In *D.M.D.,* the supreme court upheld a district court's determination that public safety would be served by granting EJJ designation to the juvenile.

nation that this factor weighs in favor of adult certification.

## Child's Culpability

■ When determining whether public safety is served by certifying the matter, the court shall consider "the culpability of the child in committing the alleged offense, including the level of the child's participation in planning and carrying out the offense and the existence of any mitigating factors recognized by the Sentencing Guidelines." Minn.Stat. § 260B.125, subd. 4(2). "For purposes of certification, the juvenile is presumed guilty of the alleged offenses." *In re Welfare of S.J.T.*, 736 N.W.2d 341, 346 (Minn.App.2007), *review denied* (Minn. Oct. 24, 2007).

Appellant argues that the district court's finding—that appellant was "equally culpable" as the other participants even though he did not sexually assault G.K.—was erroneous. Appellant argues that appellant's culpability "should be assessed in the context of the particular circumstances" of the offense and that a mitigating factor exists because appellant played a minor or passive role in the crime. *See* Minn. Sent. Guidelines II.D.2.a(2) (2010).

At the certification hearing, Moua testified that she weighed the culpability factor in favor of adult certification because appellant was present in the room when G.K. was assaulted. Moua's report from the certification study also notes that appellant "contributed to the offense by being present throughout the offenses and failed to remove himself of any involvement." Moua acknowledged during the hearing that there was no indication that appellant was involved in dragging G.K. from the car, bringing her into the room, or holding her down.

Dr. Hertog also testified at the certification hearing and noted that appellant was in the room when the assault occurred, observed it occurring, and did not do anything to stop it. Dr. Hertog also testified that appellant "apparently knew what was going to happen or likely knew what was going to happen," but that he did not directly participate in the assault. Dr. Hertog testified that appellant, as one of the people surrounding G.K. in the room during the assault, participated in the assault. Dr. Hertog distinguished between "active" participation and "direct" participation, however, noting that when he mentioned a "direct" participant, he meant someone who actually had physical contact with G.K. Finally, Dr. Hertog noted that appellant informed the police that he did not hold G.K. down because he believed the other gang members were able to do so without him. Dr. Hertog's conclusion was that the culpability factor "possibly" overcomes the presumption of certification.

■ Because we give the district court "considerable latitude" in certification matters, we conclude that the findings on this factor are not clearly erroneous. The record supports the district court's conclusion that appellant was involved in the rape of G.K.; the court considered the fact that appellant did not actually rape G.K., but determined that he was not less culpable as a result. The court did not clearly err when it weighed this factor in favor of adult certification.

## Prior Record of Delinquency

When determining whether public safety is served by certifying the matter, the court shall consider "the child's prior record of delinquency." Minn.Stat. § 260B.125, subd. 4(3). This factor, along with the seriousness of the alleged offense, "shall" be given greater weight than the other factors. While appellant has had prior police contacts involving truancy, theft, and curfew, he has no prior record of delinquency involving probation and no

history of adjudication. The district court determined that this factor favors EJJ designation. However, as discussed below, it does not appear that the court gave any greater weight to this factor than to any other factor, contrary to the statutory mandate.

*Programming History*

When determining whether public safety is served by certifying the matter, the court shall consider "the child's programming history, including the child's past willingness to participate meaningfully in available programming." Minn.Stat. § 260B.125, subd. 4(4).

Both parties agree that appellant has had no prior programming in the juvenile-justice system because he has no delinquency history other than a few police contacts. The district court noted that there was "no evidence of any formal probation programs because the child has not been involved with probation in the past." The court then suggested that appellant's earlier school attendance record, his failure to obey rules at home by engaging in gang-related behavior, and "the seriousness of the alleged offense," along with other considerations, determined that this factor favors adult certification.

■ The court noted that it has been held that a juvenile court does not abuse its discretion by considering such factors and cited *In re Welfare of K.M.,* 544 N.W.2d 781, 785 (Minn.App.1996). In *K.M.,* the juvenile had minimal programming history and the district court based its decision regarding this factor on evidence of his failure to participate in a good-behavior contract with his school, his failure to participate in tutoring after his expulsion, and his gang-related behavior. *Id.* at 783–85. Although K.M. was not involved in formal probation programming, he was required to participate in the above-mentioned programming as a result

of his suspension and expulsion from school. *Id.* K.M. was similar to appellant here because he had little programming history, but *K.M.* is nevertheless distinguishable from this case. Although the factors analyzed in K.M.'s programming history were not formal probation programming, they were programs that K.M. was required to participate in as a result of his suspension and expulsion from school. *Id.*

Appellant here had absolutely no prior programming, formal or otherwise. The psychological evaluation and certification study reports both noted that appellant has no programming history and concluded that the factor supports EJJ designation. Dr. Hertog concluded that, based on his 23 years of treating juveniles, appellant fell into the category of a juvenile who was amenable to treatment and for whom appropriate programming was available. In addition, he opined that it was highly likely that appellant would benefit from treatment. Moua also testified that appellant has never received any type of probation. This court has previously held that this factor favors EJJ designation when the child has not participated in any programs. *See D.T.H.,* 572 N.W.2d at 744.

Nicholas Rice, a teacher at City Academy High School, testified that appellant was an "exceptional student" and one of the most dedicated of his students. Rice offered a letter from the director at the school, Milo Cutter, who stated that appellant had stayed in school even when gang members told him to leave.

Although the court found that the programming-history factor weighs in favor of adult certification, it acknowledged that there was a mitigating factor present in appellant's participation in school. The court noted that appellant had "reenrolled in high school following this offense and is

reportedly doing well in the environment of his school. [Appellant] should be commended for that effort and encouraged to pursue further education."

In light of the experts' reports and testimony documenting appellant's lack of programming history, the district court's findings on this factor are not supported by the record. This factor favors EJJ designation, and the district court clearly erred by determining that this factor favors adult certification.[2]

*Adequacy of the Punishment or Programming Available*

When determining whether public safety is served by certifying the matter, the court shall consider "the adequacy of the punishment or programming available in the juvenile justice system." Minn.Stat. § 260B.125, subd. 4(5). The district court found that "[t]he only way this factor could be viewed as overcoming the presumption would be if there were [sic] clear and convincing evidence the programming available in the juvenile justice system was at least likely to assure [appellant's] rehabilitation and public safety."

The district court held that "the punishment and programming in the juvenile justice system would be inadequate for a violent crime of this nature" and "would not be commensurate with the seriousness of this heinous offense," once again emphasizing the seriousness of the crime over all other factors. The court mentioned Dr.

Hertog's testimony that he was "not sure" whether appellant would pose a threat to public safety, even with all available programming. The district court also noted that "[e]veryone acknowledges that [appellant] could run from a non-secure facility and that the public would be at great risk if that would happen." Even if appellant was assigned to a secured treatment facility, the court found that "the lengths of confinement, programming, and supervision are inadequate to ensure public safety."

Appellant argues that the court failed to explain how available programming is insufficient to address his alleged behavior. Appellant further argues that the court's reliance on both experts' testimony that they could not *guarantee* that appellant would be successfully rehabilitated was disingenuous because such a guarantee can never be made.

■ Both of the experts determined that the programming-history factor weighs in favor of EJJ designation. The certification study found that appellant would benefit from "structured supervision, activities, community supervision, and involvement in positive pro-social programs." The report from the psychological evaluation noted that appellant is "amenable to intervention [ ] because he does not have any significant problems with anger, is generally compliant and does not have a mental illness." Moua testified that

---

**2.** Contrary to the claim made in the dissent, we are not suggesting that a juvenile without a prior delinquency record and programming history is entitled to remain in the juvenile justice system on that basis alone. While the lack of a prior record is to be given greater weight than all factors other than seriousness of the offense, programming history is but one of the four remaining factors to be considered when determining whether the public safety is served by certification. Further, the cases cited in the dissent in support of this claim

are easily distinguishable from this case, either involving an allegation of murder in the first degree, which now results in immediate transfer to the adult system, or certification supported by expert testimony suggesting that the juvenile was not treatable within the juvenile system. *See S.J.T.*, 736 N.W.2d 341; *In re Welfare of D.T.N.*, 508 N.W.2d 790 (Minn. App.1993); *review denied* (Minn. Jan. 14, 1994); *In re Welfare of J.A.R.*, 408 N.W.2d 692 (Minn.App.1987), *review denied* (Minn. Aug. 26, 1987).

there were a number of facilities, including secured facilities, which are likely to accept appellant for treatment because he has not participated in any programming before this charge.

Moua testified that she considered appellant's association with gang members to be the only barrier to successful treatment, but that the barrier could be overcome by close supervision and making sure that the conditions of his probation would include disassociating himself from his friends who are gang members. Moua also believed that "44 months gives [appellant] enough time to work with Probation to be successful. It also would give us enough time to figure things out for [appellant], if EJJ designation is appropriate or if he should be revoked and returned to the adult courts." The Minnesota Supreme Court has noted that, "An initial juvenile disposition reinforced by the possibility of adult sanctions gives juveniles a certainty of punishment combined with an opportunity to be successful in the juvenile system." *State v. Garcia,* 683 N.W.2d 294, 300 (Minn.2004) (quotation omitted).

In light of the evidence presented by the experts' reports and their testimony regarding the programming available to appellant, the district court clearly erred by finding that this factor favors adult certification.

*Dispositional Options*

When determining whether public safety is served by certifying the matter, the court shall consider "the dispositional options available for the child." Minn.Stat. § 260B.125, subd. 4(6). Certification is presumptive in this case, so the only available dispositional options are adult prosecution or EJJ designation. Minn.Stat. § 260B.125, subd. 8(b) (Supp.2011).

The district court compared the 42 [3] months of EJJ with the possible sentence of 204–336 months that appellant would receive as an adult. The court focused on the difference in this length of time and concluded that "long-term supervision in the adult system is far more prudent." However, Moua testified that she was able to reconcile the difference between the length of time that appellant would serve if convicted of these offenses as an adult with the significantly shorter 44–month probation period because appellant "has not ever been placed on probation and we also understand that being designated EJJ, he would have a sentence, an adult sentence that would be stayed if he was to violate or get his status revoked."

In considering this factor, the court ignored the fact that designating appellant EJJ does not mean that he necessarily avoids the prison sentence that would be imposed upon an adult. Appellant must successfully complete the EJJ programming; if he violates the terms of EJJ programming, the adult prison sentence could, and most certainly would, be executed. *See generally* Minn.Stat. § 260B.130, subd. 5 (2010). In other words, part of the 42 months of EJJ would be served in addition to a prison sentence. On the other hand, if he successfully completes 42 months of EJJ supervision, it would mean that the public safety had been served by appellant's cooperation with programming and law-abiding behavior. Further, appellant would still be required to register as a predatory offender pursuant to Minn.Stat. § 243.166, subd. 1b(a)(1)(iii) (Supp.2011). Based on the reports and testimony in the record, the district court clearly erred by

---

**3.** The court indicated that EJJ supervision would last 42 months, although 44 months was the number used at the time of the hearing.

finding that this factor weighs in favor of adult certification.

## II. By giving greater weight to the seriousness of the offense but not to appellant's prior record of delinquency, the district court abused its discretion.

■ In considering the factors under Minn.Stat. § 260B.125, subd. 4, "the court shall give greater weight to the seriousness of the alleged offense and the child's prior record of delinquency than to the other factors listed in this subdivision." *See also P.C.T.*, 823 N.W.2d at 684–85. Certification may not be based solely on the seriousness of the alleged offense. *See In re Welfare of K.A.P.*, 550 N.W.2d 9, 12 (Minn.App.1996), *review denied* (Minn. Aug. 20, 1996).

■ In *P.C.T.*, this court found an abuse of discretion in designating a juvenile EJJ because the court had failed to give greater weight to both the seriousness of the offense and the juvenile's prior record of delinquency. 823 N.W.2d at 685–86. In that case, the juvenile was charged with a serious offense *and* he had a prior felony delinquency record involving a firearm. *P.C.T.* does not stand for the proposition that a juvenile's prior delinquency record deserves greater weight only if it is extensive; the absence of a prior delinquency record is to receive greater weight as well.

The dissent suggests that if this court finds an abuse of discretion in certifying a juvenile for the same failure found in *P.C.T.*, a failure to properly follow the statutory directive and give greater weight to *both* the seriousness of the offense and the prior delinquency record, it is not offering "guidance to the district courts." On the contrary, the guidance could not be more clear. Both *P.C.T.* and this case stand for the same proposition: factors (1) and (3) found in Minn.Stat. § 260B.125,

subd. 4 *must* be given greater weight than the other factors listed, whether the court designates the proceeding an EJJ proceeding pursuant to Minn.Stat. § 260B.130 or certifies the proceeding for action under the laws and court proceedings controlling adult criminal violations pursuant to Minn. Stat. § 260B.125, subd. 1. Failure to properly follow the statute in either designating EJJ or in certifying to adult court will likely result in a finding of an abuse of discretion, as the court found in *P.C.T.* and as we find here.

Underlying the district court's analysis of the statutory factors here, as evidenced by repeated references to the seriousness of the offense in the findings, is the belief that some offenses are so serious that EJJ designation is inappropriate. Yet the legislature and the current statutory scheme provide otherwise. First, Minnesota law designates only one offense so serious that, if alleged to be committed by a juvenile 16 years of age or older, results in immediate transfer to the adult system: murder in the first degree. *See* Minn.Stat. § 260B.103, subd. 1 (2010). Reasonable minds may differ as to whether that list should include other offenses, but as of now it does not. Second, for all other offenses, public safety is determined through a consideration of six factors, with the court directed to "give greater weight to the seriousness of the alleged offense and the child's prior record of delinquency." Minn.Stat. § 260B.125, subd. 4.

Appellant argues that seriousness of the offense should not automatically tip the balance in favor of certification and that, while both the certification study and the psychological evaluation weighed this factor more heavily, they also weighed the lack of a prior record of delinquency more heavily, and they both ultimately recommend EJJ designation.

While the district court acknowledged that the lack of a prior record weighs in favor of EJJ designation, it did not expressly weigh the factor any heavier than the other factors, while giving great weight to the seriousness of the offense.[4] If the language of Minn.Stat. § 260B.125, subd. 4, is to have any meaning, then the district court should expressly weigh these two factors separately from the remaining factors. To state it another way, unless and until the legislature either (1) amends Minn.Stat. § 260B.103, subd. 1, to provide that alleged offenses other than murder in the first degree result in immediate transfer of a juvenile over the age of 16 to the adult system, or (2) amends Minn.Stat. § 260B.125, subd. 4, to provide that only the seriousness of the alleged offense is to be given greater weight when determining whether public safety is best served by certification, it is incumbent upon the district court to specifically delineate the impact of both of the factors to be given greater weight under the statute. The language of the statute suggests that the more serious the alleged offense is, the more significant the lack of a prior record of delinquency becomes for a juvenile seeking EJJ designation. Arguably, under this statutory framework, the presence of a serious offense is offset by no prior record of delinquency, leaving a consideration of the other four factors as the framework for a decision as to whether EJJ designation is proper. Here, the only other factor that favors adult certification is the culpability of appellant. The remaining three factors, appellant's programming history, the adequacy of the punishment or programming available, and the dispositional options, all favor EJJ des-

ignation. We therefore conclude that the district court incorrectly determined that the seriousness of the offense and appellant's culpability outweigh all of the other factors.

## DECISION

Appellant rebutted the presumption of certification by demonstrating by clear and convincing evidence that retaining his case in juvenile court serves the public safety pursuant to Minn.Stat. § 260B.125, subds. 3–4. The district court abused its discretion by ordering that appellant be certified for prosecution as an adult.

Because we reverse the certification decision based on the statutory factors, we do not reach appellant's additional argument that certifying him as an adult was unconstitutional.

**Reversed.**

HOOTEN, Judge (dissenting).

I respectfully dissent. There is no dispute that appellant meets the requirements for presumptive certification as an adult. The burden, then, is on appellant to rebut the presumptive certification "by clear and convincing evidence that retaining the proceeding in the juvenile court serves public safety." Minn.Stat. § 260B.125, subd. 3 (2010); *see also* Minn. R. Juv. Delinq. P. 18.06, subd. 1. As the majority acknowledges, "a district court has considerable latitude in deciding whether to certify a case for adult prosecution" and its "decision will not be reversed unless the [district] court's findings are clearly erroneous so as to constitute an abuse of discretion." *In re Welfare of*

---

4. The dissent suggests that we are reversing the district court because it weighed the seriousness of the offense too heavily. On the contrary, the district court properly gave greater weight to the seriousness of the of-

fense. What the court failed to do was to comply with the entire mandate of Minn.Stat. § 260B.125, subd. 4, by failing to give greater weight to the lack of a prior juvenile record as well.

*D.T.H.,* 572 N.W.2d 742, 744 (Minn.App. 1997) (quotations omitted), *review denied* (Minn. Feb. 19, 1998).

Clear and convincing proof is "more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *State v. Jones,* 753 N.W.2d 677, 696 (Minn.2008) (quotation omitted). Clear and convincing proof exists when the truth of the asserted facts is "highly probable." *Id.* at 696 (quotation omitted). To prove a claim by clear and convincing evidence, a party's evidence should be unequivocal and uncontradicted, and intrinsically probable and credible. *Deli v. Univ. of Minn.,* 511 N.W.2d 46, 52 (Minn.App. 1994), *review denied* (Minn. Mar. 23, 1994). In determining whether the evidence is clear and convincing, this court defers to the district court's ability to assess the credibility of witnesses. *In re Welfare of L.A.F.,* 554 N.W.2d 393, 396 (Minn.1996); *In re Commitment of Ramey,* 648 N.W.2d 260, 269 (Minn.App.2002), *review denied* (Minn. Sep. 17, 2002).

On appeal, our review is rather limited; we are to determine whether the district court's conclusion that appellant failed to rebut the presumptive certification by clear and convincing evidence is so clearly erroneous that it constitutes an abuse of discretion. The presumptive certification statute is not focused on whether it is in the best interests of a juvenile to retain the proceedings in juvenile court. Rather, the focus is whether appellant is able to show "by clear and convincing evidence that retaining the proceeding in the juvenile court serves public safety." Minn. Stat. § 260B.125, subd. 3; *see also In re Welfare of L.J.S.,* 539 N.W.2d 408, 413 (Minn.App.1995), *review denied* (Minn. Jan. 25, 1996). In placing the burden of persuasion on defendant, the legislature indicates that public safety is the dominant

concern in certification cases. *L.J.S.,* 539 N.W.2d at 413.

I agree with the majority's position that certification should not be automatic or immediate for offenses other than murder in the first degree. However, the legislative intent of Minn.Stat. § 260B.125 (2010) is clear. First, for offenses such as that involved here committed by 16– and 17–year–olds, the legislature indicates that the certification of the juvenile is presumed. Minn.Stat. § 260B.125, subd. 3. Second, when certification is presumed, the burden is on the juvenile "to rebut this presumption by demonstrating by clear and convincing evidence that retaining the proceeding in the juvenile court serves public safety." *Id.* Finally, the legislature's intent is further manifested in subdivision 8 of that section, which, for a presumptive certification decision, only requires the district court to make written findings "as to why certification is not ordered" and "why the retention of the proceeding in juvenile court serves public safety." These provisions indicate that, while certification is not automatic, the legislature intended that only juveniles who are able to meet their high burden of proof in overcoming the presumption of certification continue in EJJ, if such retention is in the interests of public safety. In the event the district court finds that a juvenile has shown that the presumption of certification is overcome by clear and convincing evidence, the district court must justify its decision to retain the juvenile in EJJ by setting forth the facts and reasoning why such result satisfies public safety.

Based on the record in this case, substantial evidence supports the district court's finding that appellant failed to overcome the presumption of certification by clear and convincing evidence. In considering "whether the public safety is served by certifying the matter," the dis-

trict court was required to evaluate the factors set forth in Minn.Stat. § 260B.125, subd. 4(1–6). If the juvenile "fails to provide sufficient evidence regarding each of the statutory factors, the matter must be certified." *In re Welfare of L.M.*, 719 N.W.2d 708, 711 (Minn.App.2006). "These factors ... are intended to assess whether a juvenile presents a risk to public safety and thus aim to predict whether a juvenile is likely to offend in the future." *In re Welfare of H.S.H.*, 609 N.W.2d 259, 262 (Minn.App.2000). "In the end, the factors must show that a risk to public safety exists because the juvenile's behaviors are likely to continue." *Id.*

### First Factor: Seriousness of the Offense

The parties do not dispute that this factor favors certification. For purposes of the certification hearing, "the juvenile is presumed guilty of the alleged offenses." *In re Welfare of S.J.T.*, 736 N.W.2d 341, 346 (Minn.App.2007), *review denied* (Minn. Oct. 24, 2007). In addition to the charges of first-degree criminal sexual conduct, conspiracy to commit first-degree criminal sexual conduct, and kidnapping, appellant was also charged with committing a crime for the benefit of a gang. A "criminal gang" means

> any ongoing organization, association, or group of three or more persons, whether formal or informal, that[ ] (1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9; (2) has a common name or common identifying sign or symbol; and (3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.

Minn.Stat. § 609.229, subd. 1 (2010); *see also* Minn.Stat. § 609.11, subd. 9 (2010) (listing criminal sexual conduct).

The district court also must consider "the seriousness of the alleged offense in terms of community protection, including the existence of any aggravating factors recognized by the Sentencing Guidelines, the use of a firearm, and the impact on any victim." Minn.Stat. § 260B.125, subd. 4(1). "In considering these factors, the court shall give greater weight to the seriousness of the alleged offense and the child's prior record of delinquency than to the other factors listed in this subdivision." *Id.*, subd. 4; *see also St. Louis Cnty. v. S.D.S.*, 610 N.W.2d 644, 650 (Minn.App. 2000) ("We cannot emphasize too strongly that the trial court must place greater weight on the severity of the alleged crime and the prior delinquency record of the juvenile in deciding whether to certify.").

The district court acknowledged several facts establishing the seriousness of the alleged offense:

- Appellant "was one of nine gang members who conspired to rape a 14–year–old female."

- The victim "was provided alcohol to induce intoxication and gain her compliance, and impair her ability to defend herself against their attack."

- The victim attempted to leave the residence, but "was kidnapped, removed from a vehicle against her will, and held down while the sexual assault occurred."

- The "victim was forcibly slammed down onto a mattress on the floor in a small room, forcibly restrained and held down as she was fondled, penetrated, and raped" while repeatedly calling for help and attempting to escape.

Several aggravating factors under the Minnesota Sentencing Guidelines may apply in these circumstances, including the particular vulnerability of the victim due to her age, Minn. Sent. Guidelines II.D.2.b.(1) (2010), the commission of the crime with

particular cruelty, *id.,* II.D.2.b.(2) (2010), or as part of a group of three or more offenders, *id.,* II.D.2.b.(10) (2010). The record also establishes that the victim, who had been a good student prior to the rape, has left school, no longer lives in her home, has psychological issues, and engages in self-injurious behavior. It was reported that the sexual assault instilled fear in the victim, her family, and the community and there was testimony that the victim and her family are afraid of the gang.

**Second Factor: Culpability of the Juvenile**

The district court found that appellant did not rebut the presumption of certification by clear and convincing evidence relative to this factor. The majority concedes that this finding was not clearly erroneous.

**Third Factor: Prior Record of Delinquency**

The district court found that appellant rebutted the presumption of certification by clear and convincing evidence relative to this factor.

**Fourth Factor: Programming History and Amenability to Programming**

The district court found that appellant failed to rebut the presumption of certification by clear and convincing evidence relative to his programming history. In its evaluation under this factor, the district court was required to examine the juvenile's "past willingness to participate meaningfully in available programming." Minn.Stat. § 260B.125, subd. 4(4); Minn. R. Juv. Delinq. P. 18.06, subd. 3(D). While acknowledging that appellant had no formal programming on probation, the district court found that he had failed to cooperate with authority at his home and school.

The record revealed that, even though appellant's father instructed appellant on numerous occasions not to associate with gang members or get gang tattoos, he had no control over appellant, and appellant continually disobeyed his father's directives. Notwithstanding his father's attempts to encourage appellant to engage in positive activities, there was evidence that appellant continually defied his father by leaving the house without permission, disappearing every weekend, committing curfew violations, and associating as a member of a gang for five years. And, there was evidence that appellant, in further defiance of his father's directives to avoid any association with gangs, actually recruited his younger brother to join the gang. The record indicated that appellant's long-term affiliation with the gang had become a lifestyle, one that he had experienced since he was 12 years old, and that the person that he respected most was not his father, but the leader of the gang.

Appellant asserts that, as evidence that he was willing to cooperate with available programming, he has shown a marked improvement in his school performance. Prior to September 2011, appellant had poor school attendance record and failing grades. There is no indication that appellant has any mental health issue or developmental disability that would affect his academic performance. In September 2011, after receiving a citation for truancy, appellant withdrew from school. It was not until after this offense and a few months prior to the certification hearing, that he re-enrolled in a new high school and began achieving good grades. As was noted by the evaluating psychologist, since appellant's improved school performance only occurred over a few months prior to the certification hearing, one would have to look "at a longer time frame" before an assessment of cooperation with programming could be made. The psychologist also acknowledged that appellant's recent good grades could be an attempt "to por-

tray a very favorable impression" in light of his pending charges.

The record also is replete with evidence that appellant's defiant and uncooperative behavior continued during his detention and the investigation of this matter by providing different and conflicting versions of his involvement in the offense and his involvement in the gang to police officers and certification evaluators. The juvenile probation officers and evaluating psychologist all admitted that lying to police officers and probation would not support a finding that appellant is amenable to probation and programming.

Appellant argues that this factor should weigh in favor of EJJ because he was never offered formal programming and that the district court erred in considering informal programming in his home and school. However, we have consistently held that, in the consideration of this factor, the district court may evaluate the juvenile's willingness to cooperate with informal programming by considering his behavior in school, home, and juvenile detention and his affiliations with gangs. *See In re Welfare of P.C.T.*, 823 N.W.2d 676, 683 (Minn.App.2012), *review denied* (Minn. Feb. 19, 2013) (holding that the juvenile's failure to go to school or participate in online schooling did not support a finding that he was willing to cooperate with juvenile programming); *see also In re Welfare of N.J.S.*, 753 N.W.2d 704, 711 (Minn.2008) (stating that consideration of pre-offense voluntary programming and "defiant and uncooperative behavior during [defendant's] detention" relative to the "programming history" factor was not an abuse of discretion); *In re Welfare of K.M.*, 544 N.W.2d 781, 785 (Minn.App.1996) (holding that the district court did not abuse its discretion by considering juvenile's failure to participate in school programs and affili-ation with gangs under the programming history factor).

The majority is correct that section 260B.125, subdivision 4, makes clear that "the court shall give greater weight to the seriousness of the alleged offense *and* the child's prior record of delinquency." (Emphasis added.) However, there is no caselaw or statutory support for the proposition that a juvenile with no prior delinquency record and formal programming history is entitled to remain in the juvenile justice system; rather, such factors must be weighed by the district court within the context of the other statutory factors under section 260B.125, subdivision 4, in determining whether the presumption of certification is overcome by clear and convincing evidence." *See S.J.T.*, 736 N.W.2d at 354–55 (affirming presumptive certification relative to a first-degree criminal sexual conduct charge where juvenile had no prior delinquency record or programming history); *In re Welfare of D.T.N.*, 508 N.W.2d 790, 795 (Minn.App.1993) (affirming referral for adult prosecution when alleged offense was committed by a 17–year–old with a limited record of non-adjudicated offenses), *review denied* (Minn. Jan. 14, 1994); *In re Welfare of J.A.R.*, 408 N.W.2d 692, 695 (Minn.App.1987) (affirming referral for adult prosecution when alleged offense was committed by 14–year–old whose record consisted of adjudications of incorrigibility and lurking with intent to commit a crime), *review denied* (Minn. Aug. 26, 1987).

The burden is on appellant to prove by clear and convincing evidence that his prior programming history overcomes the presumption that retaining his case in juvenile court does not serve public safety. It was appropriate for the district court to consider appellant's history of gang affiliation and noncooperation with authority fig-

ures and structured activity in order to assess whether appellant was amenable to programming. Based upon this extensive evidence of the juvenile's defiant and un-cooperative behavior in response to infor-mal programming and during the investi-gation, the district court did not abuse its discretion in finding that appellant failed to meet this heavy burden.

**Fifth and Sixth Factors: Availability and Adequacy of Punishment and Pro-gramming in EJJ and Dispositional Op-tions**

The district court found that the punish-ment and programming in the juvenile jus-tice system would not be adequate given the seriousness of the crime and the limit-ed time available in EJJ prior to appel-lant's 21st birthday. Although Minn.Stat. § 260B.125, subd. 8, did not require writ-ten findings, the district court nonetheless explained in its certification order that "the lengths of confinement, programming, and supervision [suggested by appellant] are inadequate to ensure public safety" and do not "sufficiently punish the serious offense." The district court further found that "there are insufficient consequences, programs and protections available within the juvenile justice system to address [ap-pellant's] criminal activity, given his age and the nature of the offense involved." Finally, the district court also found that "[g]iven all the other factors, the long term gang involvement … and the nature of the gang's criminal activities," it could not "conclude that the limited supervision af-forded by the juvenile justice system through EJJ is an appropriate disposition-al option in this case." In its findings on these factors, the district court identified

three differences for public safety between EJJ and adult certification.

First, certification offered a greater length of punishment. The record sup-ports the district court's determination that, were appellant convicted of the four charges, the presumptive sentence under the Minnesota Sentencing Guidelines would be "anywhere from 204 months or consecutively for 336 months, followed by the Intensive Supervised Release[ ]." That period of intensive supervised release (ISR) could last for the remainder of ap-pellant's life. Yet, despite the victim's de-sire for accountability, the juvenile proba-tion officer that prepared the certification report testified that sending appellant, who is already 18 years old, to a juvenile facility for a period of six months up to two years, followed by probation until appel-lant turned 21, was appropriate. But the juvenile probation officer also admitted that the proposal for placement, followed by probation through the juvenile justice system, may be at odds with public safety.[1] Indeed, while the evaluators agreed that a period of probation should follow appel-lant's stay at a treatment facility, they acknowledged that appellant's EJJ proba-tion would only last until his 21st birthday. Under these circumstances, if appellant were kept in a locked facility for two years, he would be on probation for less than one year before he turned 21 years old. Once he turns 21 years old, there would be no supervision of appellant's be-havior.

Second, the record indicates that treat-ment and programming options would be readily available to appellant in adult cor-rections, but may be limited in the juvenile

---

1. In fact, a social worker from the victim's school testified that two years of placement would not be sufficient in light of the fact that the victim would have issues relating to the gang rape for the rest of her life. She ex-plained that if he was returned to the commu-nity within a year or two of the offense, the students would feel that appellant "got away with it."

system. There was general agreement among the certification evaluators that appellant may need sex-offender treatment and specialized programming to disassociate from the gang, but there was some disagreement about what treatment would be available if appellant were on EJJ status. The evaluators presented evidence of a number of residential unsecured facilities that provided either sex-offender treatment or programming to gang members, but it was not clear that any particular residential facility had the ability to address both issues. Rather, the evaluators referenced only one juvenile facility that could offer both types of programming, MCF Red Wing, which was also the only secured facility that was known to be available.

The juvenile probation officer who prepared the certification study testified that she did not consider whether any programming was available in adult corrections. But a parole officer with experience in juvenile probation, as well as with adults and juveniles certified as adults upon release from prison, testified that programming for treatment specific to the concerns of appellant is available in adult corrections. Further, he testified that, while in prison, young persons under the age of 19 may enroll in the youthful offenders program and finish high school, obtain a GED, receive vocational training, or go to college.

Finally, and most importantly, the record reveals that certifying appellant as an adult offers a far greater level of protection of the public safety. The evaluating psychologist testified that "based upon the horrendous, serious nature of the offense, . . . a locked facility would be appropriate." The psychologist explained: "[I]t's just hard to separate the offense because the offense is very reflective of who he is as a person." Further, while it was highly likely that appellant would benefit from treatment, the psychologist indicated that he could not "necessarily say that that indicates he would be highly likely to not recidivate, based on what happens after someone returns to the community, you often see a regression in their behavior." He explained that "at times youth can look pretty good in a treatment program and they'll refer to it as 'faking it until they make [it]' or 'playing the game' with very little interest in actually internalizing change."

The juvenile probation officer who prepared the certification study agreed that appellant, if convicted, should be placed in a locked facility, and further admitted that:

- Retaining appellant's case in the juvenile justice system may be in appellant's best interests, but would be at odds with what is in the best interests of public safety.

- She failed to account for the gang affiliations within appellant's family and his reported admiration for the leader of the gang, and admitted that it would "definitely be a risk to the public safety if he returned to his family" which included four possible gang members.

- Appellant's crime was "extremely violent," appellant is "a danger to the public safety," and the seriousness of the offense supports certification.

- She acknowledged appellant's lack of truthfulness regarding the different versions of his involvement in the offense and his minimization of his involvement in the incident and in the gang.

- Her ultimate plan would be to return appellant to the community after 12 to 18 months of placement, but if he continues to associate with gang members, whether in the community or in

his family, that puts the public safety at risk.

The evaluating psychologist and the juvenile probation officer's supervisor made similar admissions upon cross-examination.

A parole officer with experience with supervised release for both adults and juveniles, testified that, even upon release from prison, the adult system offered additional protection of the public through ISR, which could last for the rest of appellant's life and is "much more structured and strictly monitored" than juvenile probation. During the first four months of ISR, parole officers visit offenders at least four times at home, in the community, and at work. Offenders are initially placed on strict house-arrest between 4:00 p.m. and 8:00 a.m.; between 8:00 a.m. and 4:00 p.m., movements are restricted to treatment, job search activities, educational programming, or school. Offenders must check in when leaving the house and arrive at their designation, and cannot stop at any other location without prior approval. After four months, assuming compliance, they advance to Phase 2, under which they remain under house-arrest, but with less onerous drug and alcohol testing requirements. If offenders continue to do well on parole, their restrictions are gradually reduced. Parole officers are empowered to deal with violations by restructuring phased-in supervision or responding to serious violations by obtaining a warrant and placing offenders in custody. The parole officer explained that ISR "[d]efinitely" provides "more benefits [for] public safety" than juvenile probation.

Based upon this record, the district court did not abuse its discretion in finding that appellant failed to prove by clear and convincing evidence that the punishment and programming available in the juvenile justice system is adequate to overcome the presumption of certification. While the testimony of the evaluators focused upon the rehabilitation of appellant through juvenile programming in EJJ, none of the evaluators were able to address the issue of public safety should such programming fail and such failure becomes evident after appellant is released from probation at age 21. Yet, all agreed that if appellant continues with his long-time association with the gang upon his discharge from probation, he would be extremely dangerous. See P.C.T., 823 N.W.2d at 686 (holding that where "failure at rehabilitation will create an extreme risk to public safety, the heavier weight given by the statute to the first and third factors evidences our legislature's recognition that the risk is too great to justify an attempt to modify this offender's behavior in the juvenile system").

In upholding the district court's determination that appellant failed to overcome the presumption of certification by clear and convincing evidence, we would give effect to the intent of the legislature in assuring that the interests of public safety are paramount. See id. at 685 ("[W]e emphasize again that public safety is the touchstone of the analysis."). It is not our role to usurp this clear legislative intent by re-weighing the evidence or second-guessing the district court's credibility determinations. See In re Welfare of Children of J.B., 698 N.W.2d 160, 167 (Minn.App.2005) ("The weight to be given any testimony, including expert testimony, is ultimately the province of the fact-finder."), review denied (Minn. May 3, 2005); K.M., 544 N.W.2d at 785 ("[W]e defer to the juvenile court's credibility determinations."). Rather, the balancing of public safety factors is "not a rigid, mathematical equation" and "[j]uvenile courts should have the discretion to weigh the factors in the context they are presented." In re Welfare of D.M.D., 607 N.W.2d 432, 438 (Minn.2000).

**626**

In describing the broad discretion of the district court, our supreme court explained:

> Although three factors may favor designation and three not, that does not mean one of the factors cannot counsel so strongly for designation as to justify that conclusion. Similarly, that two factors are indicated by the statute as carrying more weight does not mean that another factor cannot tip the balance in favor of or against designation when those two factors cancel each other out.

*Id.* at 438 n. 2.

Relative to five out of the six factors, the district court determined that appellant failed to present clear and convincing evidence that retaining appellant's case in juvenile court would serve public safety. Obviously, in rejecting the recommendations of the juvenile probation officers and the evaluating psychologist that appellant should be retained in the juvenile justice system, the district court did not find such recommendations credible.

The majority opinion reverses the district court's conclusion that the presumption was not rebutted by clear and convincing evidence because it allegedly *weighed the first public safety factor too heavily.* Yet, in *P.C.T.*, we reversed the district court in a presumptive certification case for retaining a juvenile in EJJ for *insufficiently weighing the first and third factors.* 823 N.W.2d at 684–86. The primary emphasis of *P.C.T.* was that since public safety is "the touchstone of the analysis," reversal of the district court's decision retaining EJJ was appropriate in light of its failure to adequately address these public safety concerns. An affirmance of the district court in this case, where there is ample evidence that appellant failed to overcome the presumption of certification, would simply be a re-affirmance of our duty to effectuate the legislature's intent

that public safety is the paramount consideration. However, by reversing the district court on this record, we provide no guidance to the district courts in presumptive certification cases except for the proposition that we may, upon review, second-guess the district court's credibility determinations, re-weigh the public safety factors, and then reach a different result.

While the majority may disagree with the district court's credibility determinations and its analysis of the evidence, we cannot substitute our own credibility determinations and independently weigh the evidence on appeal. Given the presumption of certification and appellant's high burden of proof, and our deferential standard of review on appeal, I would affirm the district court's decision to certify the juvenile as an adult.